[Cite as *State v. Coe*, 2014-Ohio-256.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 12-13-03

    v.

ANDREW COE,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2012 CR 64

Judgment Reversed and Cause Remanded

Date of Decision: January 27, 2014

APPEARANCES:

    *Esteban R. Callejas* for Appellant

    *Todd C. Schroeder* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Andrew Coe ("Coe") brings this appeal from the judgment of the Court of Common Pleas of Putnam County challenging his conviction for burglary and his sentence. For the reasons set forth below, the judgment is reversed.

{¶2} On or about January 31, 2012, the home of Anthony Morman ("Morman") was burglarized. When Morman arrived home on February 1, 2012, he found a flat screen TV, a game console and games, two guns, knives, and miscellaneous other property missing. Earlier in the evening, the Ottawa police had observed an improperly parked vehicle belonging to Matthew Straley ("Straley"). The police found Straley with Coe and requested that Straley move the vehicle. At that time, the police saw a flat screen TV, a game console and games, two guns, knives, and other property. The police questioned Straley and Coe about the property. Coe claimed the TV was his and then refused to answer any additional questions. Straley was eventually arrested for possession of weapons while under disability and was interviewed by the police. Straley indicated that Coe had stolen the property from Morman.

{¶3} On July 30, 2012, the Putnam County Grand Jury indicted Coe on two separate offenses. Doc. 2. The first was for receiving stolen property in violation of R.C. 2913.51, a felony of the fourth degree, and the second was for burglary in

violation of R.C. 2911.12(A)(2), a felony of the second degree. *Id.* On December 14, 2012, Coe filed a motion to sever Counts I and II. Doc. 60. The motion was denied.[1] A jury trial was held on December 19 and 20, 2012. The State presented the testimony of five witnesses relevant to the burglary.[2] Coe presented the testimony of three witnesses, including his own.

{¶4} The first witness for the State was Straley. Straley testified on direct that on January 31, 2012, Coe called him to come pick him up in a trailer court in Ottawa. Tr. 142. When Straley arrived, he saw Coe with a bag and a TV. Tr. 143. They placed the TV in the trunk and Coe put the bag in the back seat of the car. Tr. 144. Straley testified that he did not see a gun placed in the car. Tr. 144. They then went to a second apartment and went inside. Tr. 145. When Straley went to get Coe, it was dark. Tr. 145. Later that night, the police arrested him for outstanding warrants and searched the car. Tr. 146. The next day, the police questioned him concerning the stolen property in his car. Tr. 147-48. As a result of a gun being found in his vehicle, Straley was charged with "attempted weapons under disability." Tr. 151.

{¶5} On cross-examination Straley admitted that the gun found in his car was a rifle and was large. Tr. 156-57. Straley testified that he did not know that Coe had stolen the items at the time he picked him up and did not know what was

---

[1] The trial court did not rule on the motion prior to trial, but it was verbally overruled at the trial. Tr. 359.
[2] Additional witnesses were presented on the receiving stolen property charge, however, since that charge is not part of the appeal, the testimony of those witnesses is irrelevant to this appeal.

in the laundry bag. Tr. 157-58. Straley also admitted that he was convicted and sentenced to prison for receiving stolen property and having a weapon while under a disability as a result of this case. Tr. 160.

{¶6} The State's second witness was Morman. He testified that Coe was an acquaintance of his and had been to his home a couple of times prior to the burglary. Tr. 166. Morman testified that when he and a friend returned to his home around midnight on February 1, 2012, he noticed that his back door was pried open and other doors were open as well. Tr. 169. Upon entering the home, he noticed that his TV and various other items were missing. Tr. 169-70. Morman then contacted the police. Tr. 170. Later the police called him to come look at a vehicle that had been found with some property in it. Tr. 171. Morman identified 90% of the property as his. Tr. 171. Morman testified that he identified the DVDs, video games, tools, a fireproof safe, knives, a replica gun, a rifle, a small case of ammunition for the rifle, and a flat screen TV which were found in the car as his stolen property. The prosecutor then had Morman identify all of his property from photographs taken of the items found in Straley's car. Tr. 175-76

{¶7} On cross-examination, Morman testified that the police had found a shoeprint at the backdoor that did not match his shoes or those of his friend. Tr. 183-84. Morman also testified that the items stolen would not have all fit inside a laundry bag. Tr. 184. Morman testified that he was in and out of the house a

couple times during the day before he came home to find the house burglarized. Tr. 186. He also admitted that on the morning of January 31, 2012, he met with the prosecutor concerning charges that his "ex" had kicked in his front door.[3] Tr. 190.

{¶8} The next witness called by the State was Lieutenant Marvin Schwiebert ("Schwiebert"), who was employed by the Putnam County Sheriff's Office at that time. Tr. 193. Schwiebert testified that he received a report that Straley's car had been investigated with "all kinds of stuff" in it. Tr. 194. Schwiebert and Ottawa Police Officer John Mullins ("Mullins") attempted to question Coe concerning the TV. Tr. 195. Coe told him that the TV belonged to his father. Tr. 195. Coe then asked for his wallet, which was lying on the floorboard of the passenger seat and refused to answer any questions. Tr. 195. Schwiebert refused to return the wallet or to give him the TV. Tr. 196.

{¶9} On cross-examination, Schwiebert testified that he did not remember the date and that he had not made a report concerning his conversation with Coe. Tr. 197. The car including the TV was impounded at the Sheriff's department. Tr. 198. Afterwards, he was not really involved in the case because it was turned over to the Ottawa Police Department. Tr. 198-99. Schwiebert testified that he did interview Straley after Straley made many requests to speak with someone

---

[3] The record is not clear if this is an ex-wife or an ex-girlfriend.

from his office.  Tr. 200.  Straley was attempting to "work his way out of" his problems by offering to buy drugs for the department and become a confidential informant.  Tr. 200.  Schwiebert admitted, after reviewing the report written by Mullins following the encounter with Coe that Mullins' version did not agree with his.  Tr. 208.

{¶10} The fourth witness presented by the State was Mullins.  Mullins testified that he observed Straley's vehicle parked improperly, ran the license plate number and learned that Straley had an outstanding warrant.  Tr. 210-11.  Mullins then attempted to locate Straley to ask him to move the vehicle.  Tr. 211.  Coe answered the door and said it was not his vehicle, but offered to move it.  Tr. 211.  While Coe and his girlfriend, Nicole Ott ("Ott"), attempted to start the vehicle, which would not start, Deputy Brecht arrived.  Tr. 212.  Mullins observed Straley in the window and asked Coe to have him come down.  Tr. 212.  After the car was moved to a legal parking spot, Mullins placed Straley in custody on the outstanding warrant.  Tr. 212.  Eventually the trunk was opened and Mullins observed the TV, a gun, and some other objects in the trunk.  Tr. 213.  In the driver's compartment there was an open container of beer, some "zigzag papers" and some bullets along with a wallet.  Tr. 214.  The wallet was identified as belonging to Coe.  Tr. 214.  When Mullins and Schwiebert questioned Coe, Coe

told them that the gun was not his, but the TV was. Tr. 214. Coe then refused to answer any more questions and the vehicle was impounded. Tr. 215.

{¶11} On cross-examination Mullins testified that Deputy Brecht searched the vehicle. Tr. 216. Mullins agreed that if he had remembered Coe stating that the TV was his fathers, that detail would have been in his report. Tr. 220. However, he did not recall that statement. Tr. 220. After speaking with Coe, his further involvement at the time was to take Straley to jail on the warrant. Tr. 222.

{¶12} The fifth and final witness to testify for the State concerning the burglary charge was Ottawa Police Officer Abbot Carder ("Carder"). Carder took the photos of the contents of Straley's vehicle and photographed the scene at Morman's home. Tr. 230-32. Carder testified that Straley contacted him and offered to cooperate in order to get some type of deal. Tr. 233. Straley told Carder that he met Coe at the trailer and helped him load items into Straley's vehicle. Tr. 234. Carder stated that when he was interviewing Coe at a later time on a different incident, Coe refused to answer any questions concerning this burglary.[4] Tr. 237-38. On cross-examination, Carder testified that a shoeprint was found at the scene and a case was made of that print. Tr. 241. He testified that the witnesses did not identify Coe as being at the scene of the burglary. Tr. 247. An

---

[4] No objection to the testimony was made.

elderly witness had seen two white males at the scene, but could not identify them from the photos given. Tr. 248.

{¶13} Coe presented the testimony of three witnesses including him. His first witness was Ott. Ott was called to the stand, but refused to testify. She invoked her Fifth Amendment right to remain silent on the advice of counsel. Tr. 286-89. The trial court then instructed the jury as to what had happened. Tr. 289.

{¶14} Coe then testified on his own behalf. Coe testified that on January 31, 2012, Straley took Coe to Ottawa in exchange for gas money. Tr. 294. Coe testified that he dropped his wallet in Straley's car when he paid for the gas and cigarettes, that he just forgot to put it back in his pocket when he got back into the car at the gas station. Tr. 294. Straley then took him to Ott's apartment in Ottawa and dropped him off. Tr. 295. Coe claimed that he did not leave Ott's apartment once he arrived. Tr. 296. Coe testified that during the drive to Ottawa, he mentioned to Straley that he was looking to buy a flat screen TV. Tr. 296-97. Later that night, Straley arrived at the apartment with a TV to sell to Coe. Tr. 298. Straley also tried to sell some DVDs to another person at the apartment. Tr. 299. When Coe saw the flashing lights out the window, he went down to investigate. Tr. 299. Coe then claimed that he went up and spoke to Straley before returning to the car and trying to start it. Tr. 300. He could not get it started, so Ott came down and tried to start the car. Tr. 300. When it would not start for Ott, they

returned to the apartment and Straley went down. Tr. 300. Approximately an hour later, Mullins and Schwiebert came up to the door and asked him if he knew what was in the car. Tr. 301. Coe testified that he told them he knew there was a TV and some DVDs because Straley had tried to sell them. Tr. 301. Coe testified that he thought the TV belonged to Straley and his girlfriend. Tr. 302. When Schwiebert continued to ask him questions, he told them he did not want to answer any more questions and attempted to shut the door. Tr. 302. Coe denied that he was at Morman's home on the day in question and indicated that if he had been there, people would have recognized him. Tr. 305.

{¶15} The final witness to testify on Coe's behalf was Ottawa Police Patrolman Joshua Strick ("Strick"). Strick was requested by the prosecutor's office to compare the shoeprint cast made in January with the shoes belonging to Coe. Tr. 325. He compared the two and found they did not match. Tr. 325. The prosecutor's office did not ask him to compare it with shoes belonging to anyone else. Tr. 325.

{¶16} Following all of the testimony, the jury returned a verdict of not guilty on the receiving stolen property count and a verdict of guilty on the burglary count. Doc. 83. On February 6, 2013, the trial court sentenced Coe to eight years in prison for the burglary conviction. Doc. 98. Coe filed his notice of appeals

from the judgment on February 19, 2013. Doc. 102. On appeal, Coe raises the following assignments of error.

### First Assignment of Error

**The trial court erred when it denied [Coe's] motion for acquittal as the State failed to prove an element of the crime charged.**

### Second Assignment of Error

**The trial court erred when it denied [Coe's] motion for separate trials.**

### Third Assignment of Error

**The trial court erred when it accepted the jury's guilty verdict which was clearly against the manifest weight of the evidence.**

### Fourth Assignment of Error

**The trial court erred when it allowed a sleeping juror to remain.**

### Fifth Assignment of Error

**The trial court erred when it allowed the prosecutor to violate [Coe's] right to remain silent.**

### Sixth Assignment of Error

**The trial court erred when it imposed the maximum sentence.**

In the interest of clarity, we will be addressing the assignments of error out of order.

{¶17} Coe alleges in his fifth assignment of error that the State committed prosecutorial misconduct when it commented on Coe's refusal to answer questions

during closing argument. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he prosecution must avoid insinuations and assertions which are calculated to mislead the jury." *Id.* In cases of clear misconduct, a mere instruction that closing arguments are not evidence is insufficient to remedy the error. *Id.* at 15. Additionally, "[w]e will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121, 767 N.E.2d 166. Improper closing arguments must be viewed in the context of the entire trial. *Id.* at ¶168.

{¶18} The question of whether commenting on a defendant's silence prior to arrest has been addressed by the Ohio Supreme Court in *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335. In *Leach*, the police contacted the defendant and set up an appointment to have him come to the station for questioning. Prior to the questioning, the defendant contacted the police and told them he would not answer questions and he wished to consult an attorney. During opening statements, the prosecutor made comments concerning the defendant's refusal to answer questions. In addition, the prosecutor elicited responses from witnesses during the case-in-chief indicating that the defendant had refused to

answer police questions. In reviewing the issue, the Ohio Supreme Court held "that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id*. at ¶38. If the evidence is not overwhelming, then the use of the pre-arrest silence is "clearly prejudicial." *Id*.

{¶19} This court has also dealt with an issue where a defendant's silence has been used against him during trial in *State v. Perez*, 3d Dist. Defiance No. 4-03-49, 2004-Ohio-4007. In *Perez*, a police officer testified that while answering questions, the defendant stopped the questioning by asking for counsel. This court held that it was error for the trial court to allow the testimony that the defendant exercised his right to remain silent. *Id*. at ¶17. "This error will only be found harmless if it is clear, beyond any reasonable doubt, that absent the allusion to Perez's invocation of his right to remain silent, the jury would have returned a verdict of guilty." *Id.* This court then discussed the basis for finding the error to be harmful.

> **In *Leach*, the Court addressed the dangers of allowing into evidence a defendant's decision to remain silent. Specifically, it mentioned that a defendant in such a situation would be forced to choose between allowing the jury to infer guilt from his prior silence and taking the stand in order to explain the prior silence. * * * This is exactly what happened to Perez.**
>
> **After evidence of his silence during interrogation was allowed to come before the jury, Perez took the stand and attempted to explain why he had not spoken with the police. In fact, Perez**

> **was cross-examined by the prosecution in great detail concerning his decision to remain silent. * * * Furthermore, during closing arguments, the prosecution stated to the jury that the reason Perez had invoked his right to remain silent was because he knew that the "gig" was up. * * ***
>
> **It is clear from these comments that the introduction of evidence concerning Perez's right to remain silent cannot be found to be harmless error beyond a reasonable doubt. Because Perez's silence was admitted into evidence, he was forced to testify and explain why he had remained silent. Additionally, the prosecution used Perez's testimony to infer to the jury that his silence implied that he was guilty. This is the exact situation that was meant to be avoided by having a defendant's silence remain inadmissible and a clear violation of Perez's due process rights.**

*Id*. at ¶¶18-20 (citations omitted).

{¶20} A review of the record in this case reveals the following instances of questionable statements by the State. During opening statements, the prosecutor made the following statement.

> **When an officer spoke to Defendant Coe about that property, Coe stated, that TV is mine, but after that refused to answer any additional questions.**

Tr. 135. During the questioning of Schwiebert, the following testimony was elicited.

> **Q.   Did you have an opportunity to have a discussion with [Coe] on that date?**
>
> **A.   Yes, I did.**
>
> **Q.   Did that discussion concern the contents of the car?**
>
> **A.   Yes, it did.**

**Q.    Did it also include the subject of the TV within the trunk?**

**A.    Yes, it did.**

**Q.    Did he have any statement for you concerning that TV within the trunk?**

**A.    He said that he was at his father's and the TV belonged to his dad.**

**Q.    Did he indicate that the TV was there because of him then and it was his father's?**

**A.    He said that him and [Straley] was at his father's and they come back and the TV belonged to him.**

**Q.    Did he provide any other statement?**

**A.    No.  He told me, basically, screw myself, he wanted his wallet back, and leave him alone.**

Tr. 194-95.  The prosecutor then offered the following testimony of Mullins.

**Q.    Did you have any conversation with Coe on that date?**

**A.    Me and [Schwiebert] went back to the residence, spoke with Coe, asked him about the articles in the vehicle; and he was advised that, you know, his wallet was found in the vehicle.**

**Q.    Did he make any statement as to the other property within the vehicle?**

**A.    He stated the gun was not his but the TV was his.**

**Q.    And [Schwiebert] just testified, and he indicated that he recalled Coe identifying the TV as coming from his father's.  Do you recall that?**

-14-

**A.   I don't recall where he said the TV came from, but I knew he did say it was his TV.**

**Q.   At any point did he stop cooperating and refuse to answer questions?**

**A.   Yes, he did.**

Tr. 214-215.   The last witness offered by the State was Carder who testified concerning Coe's exercise of his Fifth Amendment right to silence as follows.

**Q.   Were any of your attempts to locate Coe successful?**

**A.   Yes.  A few months after this incident, it was on a separate complaint completely, and Mr. Coe was at that location.  I asked him if he would talk to me about this incident; and he stated unless it had to do with the unrelated incident, he would not talk to me.**

**Q.   Did you give him an opportunity then at that time to make a statement?**

**A.   I did.**

**Q.   Okay, did he refuse to make a statement?**

**A.   Correct.**

Tr. 237-38.  All of the above statements were elicited by the State during its case-in-chief.

{¶21} On cross-examination of Coe during the defense's case, the prosecutor did not directly address Coe's refusal to answer questions.   The prosecutor did ask Coe about his lack of availability to answer questions between January and July.

**Q. Between January and July, were you aware of multiple attempts by Ottawa Police Department to contact you regarding that offense?**

**A. I only lived that one place, I have only one address; and I have a probation officer in Wood County, and I talked to him, I reported to him when the cops questioned me, because that's part of my probation; and no one ever came, nothing in the mail, no one ever came to question me.**

Tr. 319.

{¶22} During closing arguments, the prosecutor made the following arguments.

**\* \* \* police open the trunk to find a gun and a large TV, and they simply want to make an inquiry into this property, which is a reasonable action for a police officer to take.**

**But the defendant's response was entirely unreasonable, refusing any sort of cooperation answering questions. And ask yourselves if you're in a situation where police find some property and they simply ask you, do you know about this; and if you don't what's your reaction going to be? How are you going to speak to that officer?**

**And you heard from two separate officers who indicated that before Coe refused to talk that he did claim the TV as his. \* \* \***

**\* \* \* He said that TV is mine, the gun is not, don't ask me any more questions, I'm shutting the door. The police made multiple attempts to try and contact him and question him, and all of those were unsuccessful.**

Tr. 368-69. Clearly, the prosecutor was making improper inferences and comments concerning Coe's decision to exercise his Fifth Amendment right to remain silent. Contrary to the argument presented by the State, Coe was under no

obligation to answer any questions by the police. *See Leach supra.* Although Coe may not have specifically stated he was invoking his Fifth Amendment rights, he specifically told the officers that he did not wish to speak to them. Any comment on the exercise of a constitutional right is improper. Thus, the prosecutor did commit misconduct during the opening statement, the case-in-chief, and closing argument, by commenting on Coe's choice not to answer the questions of the police.

{¶23} This then leads to the question as to whether the misconduct was prejudicial. As discussed above, the evidence of guilt of burglary was not overwhelming. There were no witnesses to the burglary. The only witness to Coe's involvement was Straley. Straley claimed that Coe committed the burglary and he was just helping Coe move some items. Straley testified that he did not know that Coe had stolen the items. However, Straley's testimony was far from unimpeachable. He clearly was lying on some issues, the question was which. There was evidence that Coe had stated the TV belonged to him. However, that in and of itself does not show that Coe committed the burglary.[5] In addition, after the above statements were made in the case-in-chief, Coe may have been forced to take the stand to answer the inferences of his guilt for his refusal to answer the questions, such as was the case in *Perez, supra.* He explained that he did not want

---

[5] It may be evidence of receiving stolen property, but not that he committed the burglary.

to answer the questions because he had prior interactions with the police and they were not pleasant. By taking the stand, all of his prior convictions for burglary were allowed to be entered by the State to impeach Coe, evidence that otherwise would not have been admissible. In addition, the jury learned that Coe was on community control at the time of the offense for a prior drug offense. This information was not admissible during the State's case-in-chief, but only came in during Coe's testimony.

**{¶24}** Based upon all of the above, it is clear that the introduction of evidence concerning Coe's decision not to answer questions cannot be found to be harmless error beyond a reasonable doubt. *See Perez, supra* at ¶20. Coe was forced to testify allowing in a great deal of evidence concerning Coe's criminal history. Additionally, the prosecutor used Coe's silence to infer that he was guilty since "reasonable" people would answer the questions. "This is the exact situation that was meant to be avoided by having a defendant's silence remain inadmissible and a clear violation of [Coe's] due process rights." *Id.* The effect of the various testimony presented by the State concerning Coe's silence is that he was forced to defend his prior silence. Even then, the State attempted to use his silence against him. Therefore, the fifth assignment of error is sustained.

**{¶25}** Having found error prejudicial to Coe during the presentation of the evidence in Coe's trial, the first assignment of error challenging the denial of the

motion for acquittal, the second assignment of error challenged the denial of the motion to sever, the third assignment of error challenging the manifest weight of the evidence, the fourth assignment of error challenging the trial court's decision to allow a sleeping juror to remain, and the sixth assignment of error concerning the imposition of sentence are moot. Thus, this court need not address those assignments of error at this time. App.R. 12(A)(1)(c).

{¶26} Having found error prejudicial to appellant in the fifth assignment of error, thus making the first, second, third, fourth, and sixth assignments of error moot, we reverse the judgment of the trial court. The matter is remanded for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**ROGERS, J., concurs.**

**/jlr**

**SHAW, J., Dissents.**

{¶26} I respectfully dissent from the majority opinion. In my view, the only improper statement in this case was the statement made by the prosecutor during closing arguments. When taken in context, I do not find any of the

remaining comments discussed by the majority to be inappropriate, and, interestingly enough neither does the appellant.[6]

{¶27} However, while I agree with the majority that the prosecutor's statement in closing argument was improper, I do not agree that there is any reasonable possibility that but-for this statement the jury verdict would have been different. As a result, I would find the error harmless. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121.

{¶28} Moreover, I reject the majority's contention that Coe's testimony in this case is governed by our decision in *State v. Perez*, 3d Dist. No. 4-03-49, 2004-Ohio-4007. In *Perez* there was a clear indication that the defendant had to take the stand to address his silence due to the State improperly addressing the defendant's silence during its case-in-chief. There is no indication in the record that the defendant took the stand in this case for that purpose. On the contrary, evidence was presented at trial that Coe knew the victim (unlike State's witness Straley who did not know the victim at all), had been in the victim's trailer, was picked up at the victim's trailer with the victim's goods (perhaps with the full assistance during the burglary of Straley or perhaps without Straley's assistance as Straley testified). Furthermore, when confronted about the stolen material, Coe had already stated to

---

[6] Coe only advocates in his brief that the prosecutor's statements during closing arguments were error.

police prior to choosing to remain silent that the stolen television was either his or his father's.

{¶29} The defendant clearly wanted to tell an alternative version of the events in his testimony and clarify statements that he made to the police. Thus I would not find the circumstances of this case to be similar to *Perez*.

{¶30} Accordingly, I would overrule Coe's fifth assignment of error and proceed to address the remaining assignments.